## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| ASHLEY R. LOGAN-WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:16-cv-01327-JAR |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Ashley R. Logan-Wilson was not disabled, and, thus, not entitled to child insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-434, or supplemental security income ("SSI") under XVI of the Act, 42 U.S.C. §§ 401-434, 1381-1385. For the reasons set forth below, the decision of the Commissioner will be affirmed.

### I. Background

Plaintiff filed her disability application on April 27, 2011, alleging disability beginning on September 1, 2002. She claimed disability based on her learning disability and depression. Plaintiff's application was initially denied on July 29, 2011, and Plaintiff requested a hearing.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Such a hearing was held on December 8, 2011, at which Plaintiff, who was represented by counsel, testified. Delores Gonzales, an impartial vocational expert, also testified. By decision dated March 6, 2012, the administrative law judge ("ALJ") determined that Plaintiff was not disabled under the Social Security Act. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied, and Plaintiff appealed to this Court.

On September 14, 2014, this Court reversed the decision of the ALJ and remanded the matter, directing the ALJ to reevaluate the residual functional capacity with respect to Plaintiff's pace limitation and perform an analysis of listing 12.05(c). On March 30, 2015, Plaintiff appeared and testified at a hearing. Ms. Gonzales testified in person, and Richard Hutchison, Ph.D., an impartial medical expert, testified by telephone. The ALJ again determined that Plaintiff was not disabled under the Social Security Act on May 28, 2015. On June 22, 2016, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Here, Plaintiff argues that the ALJ erred when (1) she relied upon assumptions and incorrect findings in determining that Plaintiff performed substantial gainful activity as a home health aide; and (2) in her alternative findings, the ALJ relied upon assumptions and incorrect findings with regard to Plaintiff's impairments meeting or equaling listing 12.05, deficits in activities of daily living, residual functional capacity, and credibility.

**II.    Facts**

The Court notes that Plaintiff alleged a substantial number of statements of undisputed material facts (Doc. 14-2) that were disputed by the Commissioner (Doc. 19-1). The Court has reviewed the statements, the responses, and the record, and, where appropriate, will accept facts

2

as supported by the record.

### III.    Standards

The court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2009). "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted). The court may not reverse merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be "of such severity that [the claimant] is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). The severity of mental disorders is determined by rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation (the "paragraph B criteria"). *Id.* § 404.1520a(c)(3). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

4

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.*

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v).

## IV.    Decision of the ALJ (Tr. 389-405)

The ALJ determined that Plaintiff engaged in substantial gainful activity ("SGA") from July 2014 through the date of the decision, May 28, 2015, as a health home aid for her mother. She concluded that Plaintiff was paid by the State of Missouri $10 per hour, working 28 hours per week, which resulted in approximately $1,120 per month in earnings.

Plaintiff argued that she is allowed special work conditions, which in turn could not constitute SGA. However, the ALJ found that the earnings did not qualify as a subsidy by her employer because (1) there was no evidence that the State of Missouri received notice of any special request or conditions; (2) the work activity report completed by Plaintiff's mother showed that the claimant completed all usual work duties required of her position without

5

reported accommodations; (3) the record showed that Plaintiff was occasionally tardy by 15 minutes, but otherwise had no attendance issues; (4) Plaintiff reported that she received help from her sister, which was contradicted by Plaintiff's testimony that her sister moved out of the house; and (5) Plaintiff was not receiving more per hour than another person would receive to perform. The ALJ concluded that "[s]ince there is no accommodation of pay or reduced work responsibilities; [Plaintiff's] work is not an accommodated or subsidized position." Tr. 392.

The ALJ also found that Plaintiff's work was not an unsuccessful work attempt pursuant to 20 C.F.R. § 404.1574 because she was performing SGA before notice of the decision, which in turn precluded her from being considered for a trial work period. Therefore, Plaintiff's earnings were not an exception to SGA and that she worked at the level of SGA since July 2014.

The ALJ noted that the record did not show that Plaintiff worked from April 27, 2011, through June 2014. Therefore, "[i]n an abundance of caution," the ALJ continued through the sequential evaluation as if Plaintiff had not worked at the SGA level beginning in July 2014 and continuing through the date of the ALJ's decision.

The ALJ first determined that Plaintiff had the severe impairments of borderline intellectual functioning/mild mental retardation, major depressive disorder, and obesity, but that she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Specifically, the ALJ found that Plaintiff had a moderate restriction in activities of daily living; moderate difficulties with concentration, persistence, and pace; and experienced no episodes of decompensation.

The ALJ also determined that the evidence failed to establish the presence of a medically documented history of a chronic affective disorder of at least two years' duration that had caused

6

more than a minimal limitation of ability to do basic work activities. Similarly, with regard to listing 12.05,[2] the ALJ concluded that the record fails to support deficits of adaptive functioning, which is a requirement for listing 12.05.[3]

---

[2] Listing 12.05 (intellectual disability) provides:

12.05 Intellectual disability: intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listings) § 12.05.

The ALJ determined that after careful consideration of the entire record, Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the non-exertional limitation of routine, repetitive tasks involving occasional decision-making and occasional changes in the work setting. The ALJ limited production quotas to be based on end of workday measurements only and opined that the Plaintiff was capable of occasional interaction with the public, co-workers, and supervisors, provided the work did not require tandem tasks with co-workers. (Tr. 399).

The ALJ determined that Plaintiff's described daily activities were not as limited as stated by Plaintiff. The ALJ focused on Plaintiff's August 12, 2013 psychological consultative examination, in which Plaintiff stated she was engaged in few activities and was generally taken care of by others. However, the ALJ cited her work as a paid home health aide, which required Plaintiff to provide those exact services to her mother. The ALJ opined:

> Since these claims are contradictory, one is clearly false. Either [Plaintiff] is exaggerating her limitations and symptoms for the purpose of obtaining disability benefits, or her family is actively engaged in obtaining funds from the State of Missouri by fraudulent means. Given the widely divergent IQ scores and opposing claims of activities and abilities, [Plaintiff's] subjective complaints are found to be generally not credible. The record shows [Plaintiff] completes all usual work duties required of her position as a home health aide, a job in which she is working at the SGA level in terms of wages.

(Tr. 402). The ALJ also noted that Plaintiff made inconsistent statements in each of her three psychological consultative examinations and, in light of the objective medical evidence and subjective findings, Plaintiff showed limitations in mental function, but the limitations were no greater than shown in her RFC.

---

[3]     The ALJ specifically noted that the requirements in paragraph A were not met because Plaintiff could function in her daily activities; the requirements in paragraph B were not met because Plaintiff did not have a valid verbal, performance, or full scale IQ of 59 or less; and the requirements of paragraph C were only partially met.

8

The ALJ then explained the weight she afforded opinion evidence in the record. First, she afforded great weight to the opinion of Dr. Hutchison, the impartial medical expert who testified by telephone, that Plaintiff had moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace, along with no episodes of decompensation. The ALJ noted that Dr. Hutchison was a specialist whose opinion was timely and had a chance to review the entire record.

The ALJ assigned great weight to Dr. Hampton's opinion, which was provided as part of Plaintiff's January 11, 2012 psychological examination. (Tr. 403). Specifically, Dr. Hampton suggested that Plaintiff was able to understand and recall simple instructions, but would be moderately impaired in her ability to understand and follow through with complex directions. Dr. Hampton opined that plaintiff's concentration was moderately impaired; her pace was mildly slow compared to other young adults; her ability to adapt to social situations and work-like settings was limited; and that was not considered to be capable of managing funds independently in her own best interest. The weight afforded by the ALJ was based on Dr. Hampton's expertise and the fact that she had the opportunity to examine Plaintiff in person. Furthermore, Dr. Hampton's opinion was consistent with the record in that Plaintiff had no more than moderate limitations in any area of mental functioning.

The ALJ afforded great weight to the opinion of Dr. Armour, who performed a psychological consultative examination on July 9, 2011, based on his expertise and the fact that he had the opportunity to examine Plaintiff in person. Dr. Armour opined that Plaintiff had moderate impairment in sustaining concentration and persistence on tasks, and a moderate impairment in her ability to interact socially and adapt to her environment. Those moderate limitations were found to be consistent with the subsequent consultative examination report,

9

treatment records, and the daily activities she performed with her work as a home health aide. Tr. 403.

The ALJ afforded some weight to the state agency opinions, but found that Plaintiff was more limited in her activities of daily living than suggested in those opinions. (Tr. 403). The ALJ questioned the accuracy of Plaintiff's mother's third party function report on the basis that Plaintiff's mother was not medically trained to make exacting observations, nor was she a disinterested third party whose statements would not tend to be colored by affection for Plaintiff and a natural tendency to agree with the symptoms and limitations Plaintiff alleged. Similarly, the report was not consistent with the preponderance of the opinions and observations by medical doctors.

Finally, the ALJ specifically noted that if the claimant was as limited as her mother suggested, then Plaintiff's mother was actively engaged in defrauding the State of Missouri by allowing the state to pay full wages to Plaintiff without the requisite work being performed by her.

The ALJ concluded that Plaintiff could perform a full range of work at all exertional levels. The ALJ found that Plaintiff had nonexertional limitations and, as a result, consulted with vocational expert Delores Gonzalez to determine the extent to which those limitations eroded the occupational base of unskilled work at all exertional levels. Ms. Gonzalez opined that Plaintiff would be able to perform the requirements of representative occupations such as advanced material distributor, silver wrapper, and bagger. (Tr. 405). Based on the testimony of the vocational expert, the ALJ concluded that, considering her age, education, work experience, and RFC, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. As a result, Plaintiff was deemed not disabled.

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

#### 1. Plaintiff's testimony

On March 30, 3015, Plaintiff testified as follows. Plaintiff worked for her mom as a home health aide making her bed, helping with laundry, and helping her with her medicine. (Tr. 455). Her hours were 9:00 a.m. until 1:00 p.m. Plaintiff was able to go grocery shopping (Tr. 463), and her brother completed other chores, like cleaning the kitchen and bathroom and vacuuming. (Tr. 465). Plaintiff sometimes cooked, but only TV dinners, despite previously being interested in becoming a chef. (*Id.*). Plaintiff was occasionally late in starting her job as a home health aide because she woke up sad and emotional. (Tr. 501).

Plaintiff lived with her parents and brother, and her sister had moved out. (Tr. 462). She did not have a driver's license, nor had she tried to get one, despite having an interest in doing so. (Tr. 463-64). She did not take the bus, did not know how to take the bus, and had not tried to take the bus. (Tr. 464). She took the dog for walks, fed it, and took care of it. (*Id.*) Plaintiff had been attending college for general studies for two or three years. (Tr. 458). She had a laptop, and she used it to write papers for classes. (Tr. 461).

#### 2. Dr. Hutchison

Dr. Hutchison had the opportunity to review Plaintiff's file. (Tr. 469). He initially opined that based on Plaintiff's function report, IQ, and major depressive disorder with psychotic features, she met listing 12.05(C). (Tr. 475). However, upon learning that Plaintiff was being paid to be a home health aide for her mother, Dr. Hutchison stated that such employment would totally contradict what was contained in the function report. (*Id.*). This contradiction would

exist regardless of whether Plaintiff was working on a full-time basis or was being accommodated. (*Id.*). Dr. Hutchison opined that Plaintiff's working as a home health aide indicated that she would be able to do different types of things that she previously indicated she could not. Tr. 476.

With respect to functional limitations, Dr. Hutchison indicated that Plaintiff's ability to attend college and pass her courses, even with significant accommodations, indicated that her limitation was only in learning and acquiring information. (Tr. 481-82). Socially, she was getting along with others, and her concentration was fine. (Tr. 482). Dr. Hutchison acknowledged that learning was an issue and that it was very difficult with her intellectual level to learn new things, particularly when she was depressed, which would then affect her level of motivation and energy. (*Id.*). He pointed out that although Plaintiff indicated that she did not go out with friends, she did have friends in high school, which would make it seem that Plaintiff was capable of working with others. (*Id.*).

Dr. Hutchison opined that in future employment, Plaintiff would need a stable routine with end of workday measurements and the ability to go at her own pace. (Tr. 483-85). He placed Plaintiff's activities of daily living at moderate difficulty; social functioning at moderate difficulty; concentration, persistence, and pace at moderate difficulty;[4] and decompensation as none. (Tr. 492-93). Dr. Hutchison opined that Plaintiff did not meet or equal any of the listing 12.05 criteria. (Tr. 493).

---

[4]     Specifically, Dr. Hutchison determined that Plaintiff's pace was the issue. (Tr. 494-95).

### 3. Vocational Expert Delores Gonzales

Ms. Gonzales testified as follows. A home health aide is classified as medium, semi-skilled work with a specific vocational preparation ("SVP") of three.[5] (Tr. 500). Ms. Gonzales was puzzled that Plaintiff's mother indicated in the work activity questionnaire that Plaintiff completed all the usual duties required for the position and was able to complete all of the job duties without special assistance. (Tr. 503). However, several questions later, Plaintiff's mother indicated that special assistance was provided to Plaintiff, which included fewer or lesser duties, more breaks/rest period, lower production standards, extra help/supervision, and lower quality standards. (Tr. 502, 722).

Ms. Gonzales testified that if Plaintiff were limited to work that involved occasional interaction with the public, co-workers, and supervisors, with no tandem task and accounting for pace issues, Plaintiff could find work as an advertising material distributor, silver wrapper, or dry cleaning bagger. (Tr. 508-09, 511, 513). However, if Plaintiff tended to be off task 10% of the time, it would be a problem. (Tr. 509). It would also be a problem if Plaintiff's productivity was less than 100% at the end of the workday. (*Id.*). Additionally, the maximum amount a time a person could be absent was one day per month before the person would be subject to termination. (*Id.*).

### B. Medical Records

The Court previously reviewed all of Plaintiff's medical records, and it does so again here. Plaintiff's relevant medical records are summarized as follows.

---

[5] "In the [Dictionary of Occupational Titles], each job is assigned a number that reflects the job's specific vocational preparation time (SVP), i.e., how long it generally takes to learn the job . . . An SVP level of "three" indicates that a job requires more than one month and up to three months of training." *O'Neill v. Astrue*, 762 F. Supp. 2d 1158, 1170 (D. Minn. 2011) (internal citations omitted).

13

On July 9, 2011, Plaintiff was seen by Michael T. Armour, Ph.D., for a psychological evaluation. (Tr. 325-31). Dr. Armour observed that Plaintiff was passively uncooperative with the evaluation, and that the current evaluation was an underestimation of her current level of functioning. (Tr. 327). On the Wechsler Adult Intelligence Scale IV, Plaintiff obtained a verbal comprehension score of 61, a perceptual reasoning score of 65, a working memory score of 66, a processing speed index score of 71, and a full scale IQ score of 59. (*Id.*). Dr. Armour diagnosed Plaintiff with a reading disorder, major depressive disorder, query psychotic disorder, and mild mental retardation. (Tr. 329). Dr. Armour assigned Plaintiff a GAF score of 40-45. (*Id.*). Dr. Armour determined that Plaintiff suffered severe impairment in activities of daily living based on her assertion that she did not cook, cleaned very little, and did not do laundry. (Tr. 330). Dr. Armour determined that Plaintiff had moderate impairment in her ability to understand and remember instructions; at least moderate impairment in her ability to sustain concentration and persistence in tasks; and moderate to severe impairment in her ability to interact socially and adapt to her environment. (Tr. 330-31).

On or around January 11, 2012, Plaintiff appeared for a psychiatric evaluation with Karen Hampton, Ph.D. (Tr. 368-74). Dr. Hampton gave Plaintiff the Wechsler Adult Intelligence Scale IV test and found Plaintiff to have a verbal comprehension score of 74, perceptual reasoning score of 75, working memory score of 69, processing speed of 84, and full scale IQ of 71. (Tr. 373). Dr. Hampton determined that Plaintiff was able to understand and recall simple instructions, but would be moderately impaired in ability to understand and follow through with complex directions; Plaintiff's concentration was moderately impaired, and pace was mildly slow compared to other young adults; her ability to adapt to social situations and work-life settings was very limited, and impacted by both her psychiatric symptoms not being adequately

treated, and by her lack of experience with work-like settings; and Plaintiff was not capable of

managing funds independently in her own best interest. Overall, Dr. Hampton concluded that

Plaintiff performed better in her testing compared to testing completed Dr. Armour in July 2011,

and Plaintiff functioned in the borderline range of intellectual functioning impacted by

depressive and psychotic symptoms. (Tr. 374).

Plaintiff underwent limited mental health treatment. Plaintiff was seen by Florissant

Psychological services from June 2-June 20, 2011 (Tr. 350-58) and by Dr. Syed Mumtaz on

September 9, 2011 and October 4, 2011 (Tr. 356-58). Plaintiff was also seen periodically by her

pediatrician from September 7, 2005 through February 11, 2009. (Tr. 359-67).

Plaintiff underwent a psychological consultative examination with Shea Voelker, Psy.D.,

on August 12, 2013. (Tr. 474-751). Dr. Voelker observed that Plaintiff was coherent and

relevant; did not engage in spontaneous conversation; had poor eye contact; and was generally

pleasant but did not engage easily. (Tr. 749). Plaintiff was cooperative, her flow of thought

logical and sequential, and the rate, rhythm, and volume of her speech was normal. (Tr. 749).

Her mood was depressed with blunted affect. (Tr. 749). Plaintiff was able to repeat 3 digits

forward and two digits backward; she correctly named the President of the United States; her

express verbal judgment was intact; and she appeared to have fair insight into her psychological

problems. (Tr. 750). Dr. Voelker observed that Plaintiff's concentration appeared impaired,

persistence appeared adequate, and pace was slow. (*Id*). With regard to activities of daily living,

Dr. Voelker opined that Plaintiff had no history of paying bills or managing money; did not cook

or prepare meals; did not complete any household chores; did not go grocery shopping; stayed in

bed all day and completed no other tasks; relied on her family members to take her to all

15

necessary appointments; did not take care of daily hygiene needs; and needed multiple reminders from her mother to complete tasks. (*Id*).

Dr. Voelker diagnosed Plaintiff with depression with psychotic features, which appeared to be severely impacting her activities of daily living. (*Id*). Plaintiff's prognosis was poor to guarded with her current symptom presentation, although Dr. Voelker opined that Plaintiff's prognosis could improve with regular therapy, monitoring of suicidal ideation, and psychiatric treatment with appropriate psychotropic interventions. (*Id*).

## C. Third Party Functioning Report

On May 23, 2011, Plaintiff's mother filled out a third party Function Report. (Tr. 280-287). In Section B-Information about Daily Activities, she reported that Plaintiff goes to school and that Plaintiff's mother helps Plaintiff get ready and makes sure that her teeth are brushed and that her face is washed. (Tr. 280). Plaintiff did not take care of anyone else in the household, nor did she take care of pets. (Tr. 281). Plaintiff's mother represented that she assisted Plaintiff in numerous ways, including helping her dress, helping her bathe, combing her hair, making sure she did not overeat, reminding her to clean herself after using the bathroom, and giving her medication "so she does not overdose." (Tr. 282). Plaintiff cannot read, so she cannot drive. (Tr. 283). Plaintiff reportedly did not like being around people, and Plaintiff's mother indicated that she did not know if Plaintiff "loves her family." (Tr. 284-85).

In Section C-Information about Abilities, Plaintiff's mother reported that Plaintiff was very overweight and that she had a learning disability. (Tr. 285). Plaintiff was unable to finish a task that she started, did not talk with her family, and, when stressed, would get mad and throw things or mess up her room. (Tr. 286).

16

## V. Discussion

### a. Substantial Gainful Activity

Plaintiff first argues that the ALJ's conclusion that Plaintiff performed substantial gainful activity as a home health aide was unsupported by the record because her mother reported making accommodations for Plaintiff, who had a rate of productivity of 60%. The Commissioner argues in response that Plaintiff's work as a home health aide from July 2014 through the ALJ's decision was substantial gainful activity and demonstrated the inconsistencies in allegations about Plaintiff's abilities and activities of daily living.

SGA is defined as follows:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 404.1572(a)-(b). Work done under special conditions may not be considered SGA. 20 C.F.R. § 404.1573(c). Examples of special conditions include, but are not limited to: 1) requiring and receiving special assistance from other employees in performing the work; 2) being allowed to work irregular hours or take frequent rest periods; 3) being provided with special equipment or assigned work especially suited to the impairment; 4) only being able to work because of specially arranged circumstances; 5) being permitted to work at a lower standard of productivity or efficiency than other employees; or 6) being allowed to work because of a family relationship, past association with her employer or her employer's concern for her welfare. *Id.*

17

Working generally demonstrates an ability to perform a substantial gainful activity. *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005); *Johnson v. Apfel*, 240 F.3d 1145, 1148–49 (8th Cir.2001) ("Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility."). A plaintiff's ability to work despite her allegations of disability calls into question the sincerity of her belief that her impairments precluded all work. *Hudson v. Astrue*, No. 11-3356-CV-S-REL-SSA, 2013 WL 149669, at *17 (W.D. Mo. Jan. 14, 2013). Work performed on a part-time basis or with considerable difficulty in spite of limitations still demonstrates an ability to perform substantial gainful activity. *Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992).

While her appeal was pending before this Court, Plaintiff began working as a home health aide for her mother, and her wages were paid by the State of Missouri.[6]  Plaintiff was retained to work for $10.00 per hour for an average of 28 hours per week, which would result in $1,120 per month in earnings.[7]  A home health aide position is a semi-skilled position and includes helping her mother make the bed, with laundry, and with taking medicine.

---

[6]     The Court notes that Plaintiff had a duty to report this job and income under 20 C.F.R. § 416.708. Plaintiff failed to do so here.

[7]     There is a dispute as to whether Plaintiff actually worked 28 hours per week. Plaintiff points to an earnings report from the State of Missouri, which indicates that Plaintiff was not paid for all of the goal of 28 hours per week. (Tr. 670). Instead, the report demonstrates that Plaintiff worked, on average, 25.8 hours per week for the third quarter (July – September 2014). (*Id.*). Therefore, Plaintiff should be working 28 hours per week, which would result in $1,120 per month in earnings. The SGA threshold as of July 2014 is $1,070 per month for 2014 and $1,090 per month for 2015. (Tr. 392). The Court rejects Plaintiff's argument that this one quarterly statement establishes that Plaintiff does not meet the SGA threshold. Plaintiff began working as a home health aide in mid-July, so there are two weeks in the quarterly report in which Plaintiff was not employed, which in turn skews the earnings figure. The ALJ's decision is dated May 28, 2015. If Plaintiff wanted to supplement the record with additional earnings statements to support her position, she could have done so. However, she was hired to work 28 hours per week, which the Court will use to calculate her earnings.

Plaintiff claims that she was not engaged in substantial gainful activity because her work was done under special conditions. Plaintiff's mother filled out a work activity questionnaire with contradictory reporting on Plaintiff's capabilities. For example, she checked a box indicating that Plaintiff completed the usual work duties required of her home health aide position, while later indicating that Plaintiff was given fewer or easier work duties, more breaks, lower production and quality standards, and extra help and supervision. (Tr. 722). Plaintiff's mother did not, however, report any accommodations to the State of Missouri, nor did she reduce Plaintiff's pay per hour based on her productivity.

Even the testifying doctor and vocational expert were confused on this point, indicating that they did not understand the discrepancies in Plaintiff's mother's reporting. Dr. Hutchison opined that "if [Plaintiff is] being paid as a home health aide, that would indicate that she can do some of those types of things, and is now doing them when previously she wasn't." (Tr. 475-76). Ms. Gonzales asked "why are you allowed to have lower production standards, and lower quality standards, and fewer and easier duties, if you're not working up to the way you're supposed to, why doesn't your mother get somebody else?" (Tr. 502).

The ALJ determined that she "will not make . . . a finding of criminal intent to defraud." (Tr. 404). Instead, she relied on other evidence in the record that was consistent with the performance of tasks expected from a home health aide. For instance, the ALJ relied on Plaintiff's testimony regarding her tasks as a home health aide, that she went grocery shopping with her mother, that she walked and fed her dog, that she did laundry, made beds, and cooked simple meals and some desserts.

Other evidence in the record supports the ALJ's determination that Plaintiff was able to engage in the activities required of a home health aide. For instance, in the January 11, 2012

psychological consultative examination, Plaintiff reported that she sometimes accompanied her mother on errands, dressed and bathed herself, and fixed simple meals, such as sandwiches, and poured herself drinks. (Tr. 369). In a September 17, 2012 Missouri Critical Adaptive Behaviors Inventory Ability Statement, Plaintiff reported independently feeding herself, going to the bathroom, dressing herself, and washing herself.

The ALJ concluded that the earnings did not qualify as a subsidy; that the work activity report indicated that Plaintiff completed all usual work duties required by the position without reported accommodations; that Plaintiff, while sometimes tardy, had no attendance issues; that claimant testified that her sister moved out of the house, which meant Plaintiff was not helped by her sister in her duties; and that Plaintiff was not receiving more per hour than another person would receive to perform the same job. As a result, she concluded that Plaintiff was engaged in SGA. In light of all of the evidence in the record, including Plaintiff's mother's continuing use of Plaintiff's services as a home health aide, the Court finds that there is substantial evidence in the record to support the ALJ's finding that Plaintiff has been engaged in SGA since July 2014 and, as a result, is not disabled.

### b. Listing 12.05

Even if Plaintiff was not engaged in SGA, she would not qualify under Listing 12.05. Plaintiff broadly argues that the ALJ erred in her findings concerning Plaintiff's activities of daily living, RFC, and credibility. The Court will briefly address each item below.

Plaintiff first takes issue with the ALJ's finding regarding Plaintiff's activities of daily living because she contends the ALJ relied on erroneous assumptions about Plaintiff's subsidized work for her mother. The Court, upon review of the record, concludes that the ALJ properly made this determination. Specifically, in the decision, the ALJ relies on a January 11, 2012

psychological consultative examination, in which Plaintiff reported that she sometimes accompanied her mother on errands, dressed and bathed herself, and fixed simple meals, such as sandwiches, and poured herself drinks. (Tr. 369). Plaintiff herself testified that she went grocery shopping with her mother, walked and fed her dog, did laundry, made beds, and cooked simple meals and some desserts. (Tr. 463-65). The ALJ also noted that during a Missouri Critical Adaptive Behaviors Inventory Ability Statement dated September 17, 2012, Plaintiff reported independently feeding herself, going to the bathroom, dressing herself, and washing herself. (Tr. 738). The ALJ concluded that these activities were more consistent with Plaintiff's work as a home health aide and, as a result, Plaintiff had only moderate restrictions in activities of daily living. This determination is supported by the record.

Plaintiff next contends that the ALJ erroneously relied on incorrect information regarding work activity in her analysis of whether Plaintiff's impairments met or equaled listing 12.05. She points to Dr. Hutchison's testimony and contends that the ALJ made improper characterizations to Dr. Hutchison about Plaintiff's work activities. At the hearing, the ALJ asked Dr. Hutchison whether Plaintiff's employment as a home health aide to her mother would color Dr. Hutchison's opinion regarding Plaintiff's capabilities. (Tr. 475). The Court does not agree with Plaintiff that informing Dr. Hutchison of Plaintiff's employment as a home health aide was inaccurate or misleading; instead, the ALJ was supplementing the record for Dr. Hutchison to ensure a more complete opinion of Plaintiff's condition.

Plaintiff also takes issue with the RFC because the ALJ relied on "incorrect assumptions concerning Plaintiff's work for her mother." (Doc. 14 at 14). The Court disagrees for the reasons discussed extensively in this opinion.

21

Finally, Plaintiff argues that the ALJ improperly found Plaintiff and Plaintiff's mother not credible. The ALJ considered the record and was troubled by a glaring inconsistency. On one hand, Plaintiff was earning substantial income from the State of Missouri as a home health aide for her mother. On the other hand, Plaintiff is now seeking disability benefits from the federal government on the basis that she is so disabled that she cannot engage in any substantial gainful activity. The ALJ opined that "[s]ince these claims are contradictory, one is clearly false. Either [Plaintiff] is exaggerating her limitations and symptoms for the purpose of obtaining disability benefits, or her family is actively engaged in obtaining funds from the State of Missouri by fraudulent means." The Court finds that there is substantial evidence in the record to support the ALJ's credibility determinations which were adequately explained and supported. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).

## VI. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Soest's Complaint is **DISMISSED** with prejudice. A separate Judgment will accompany this Order.

Dated this 28th day of September, 2017.

_John A. Ross_

**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**

22